## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

SARIT K. SANTICHAVALITSKUL,     )
                                   )
          **Plaintiff,**          )
                                   )
**v.**                             )       **CIVIL ACTION NO. 3:09-00582**
                                   )
**MICHAEL J. ASTRUE,**         )
**Commissioner of Social Security,**   )
                                   )
          **Defendant.**        )

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered May 4, 2010 (Document No. 12.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 10 and 11.)

The Plaintiff, Sarit K. Santichavalitskul, (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on April 13, 2005 (protective filing date), alleging disability as of April 17, 2002, due to neck, back, and right knee injuries. (Tr. at 16, 101, 127-29, 131, 134, 384-86.) The claims were denied initially and upon reconsideration. (Tr. at 101-03, 106-08, 373-75, 377-79.) On July 13, 2006, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 99.) The hearing was held on May 23, 2007, before the Honorable Valerie A. Bawolek. (Tr. at 387-414.) A supplemental hearing was held on March 6, 2008. (Tr. at 415-54.) By decision dated May 30,

2008, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 16-26.) The ALJ's decision became the final decision of the Commissioner on March 27, 2009, when the Appeals Council denied Claimant's request for review. (Tr. at 6-8.) Claimant filed the present action seeking judicial review of the administrative decision on May 26, 2009, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2008). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's

remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2008). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme.

3

When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, April 17, 2002. (Tr. at 18, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "arthritis of the lumbar spine and lumbar spine strain, injury to knee (ACL tear) and obesity," which were severe impairments. (Tr. at 18, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 20, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform medium level work, with the exception that he could not climb ladders, ropes, or scaffolds. (Tr. at 22, Finding No. 5.) At step four, the ALJ found that Claimant could not return to his past relevant work. (Tr. at 24, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a laundry worker and hand packer at the medium level of exertion, and as a small parts assembler and hospital cleaner at the light level of exertion. (Tr. at 24-25, Finding No. 10.) On this basis, benefits were denied. (Tr. at 26, Finding No. 11.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was

5

defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on October 21, 1980, and was 26 years old at the time of the administrative hearing, May 23, 2007. (Tr. at 24, 127, 391.) Claimant had an eleventh grade education and a generalized equivalency diploma, and was able to communicate in English. (Tr. at 24, 141, 392.) In the past, he worked as a cook, fast food cook, and car wash attendant. (Tr. at 24, 135-36, 143-49, 408-09.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in (1) rejecting the opinions of Dr. Haikal and Mareda Reynolds, Claimant's

treating physician and psychologist; (2) failing to re-contact Claimant's treating medical providers as required by 20 C.F.R. § 404.1512(c); and (3) failing to follow the "slight abnormality" standard in finding that Claimant's depression was a non-severe impairment. (Document No. 10 at 2-9) In response, the Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Document No. 11 at 11-20.) The undersigned will consider Claimant's first and third arguments, regarding his mental impairment, together.

Analysis.

1. Treating Opinions.

Claimant first alleges that the ALJ erred in rejecting the opinions of his treating providers, Dr. Haikal and Mareda Reynolds. (Document No. 10 at 2-6.) Regarding Dr. Haikal's opinion, Claimant asserts that the ALJ gave greater weight to the opinions of the medical expert, Dr. Marshall, because there was nearly a three year gap between Dr. Haikal's treatment and his opinion. Claimant asserts that Dr. Haikal's treatment notes from November 11, 2004, through September 18, 2007, were submitted to the Appeals Council, and therefore, "the ALJ's reason for discounting the treating source's opinion is no longer valid." (Id. at 3-4.) Claimant further asserts that Dr. Marshall's opinion is not entitled to great weight because his "testimony could be argued to be designed to hinder the claimant from obtaining benefits." (Id. at 3.)

The Commissioner asserts in response that as the finder of fact, the ALJ was entitled to give greater weight to the opinions of Dr. Brendenmuehl and Dr. Marshall, and to rely on Dr. Marshall's testimony that Dr. Haikal's opinion was rubbish. (Document No. 11 at 18.) Contrary to Claimant's contention, the Commissioner asserts that the ALJ did not discredit Dr. Haikal's opinion solely on the three-year gap between his last exam of Claimant and his RFC assessment. (Id.) Finally, the Commissioner asserts that even if the record contained additional records from Dr. Haikal, the ALJ was entitled to give greater weight to the opinions of the medical experts because their opinions were

supported by the record and because the evidence did not support the degree of Dr. Haikal's assessed limitations. (Id.)

Regarding Ms. Reynolds's opinion, Claimant asserts that the ALJ neither assigned any weight to her opinion nor discussed her reasons for giving the opinion controlling weight. (Document No. 10 at 5.) Claimant asserts that the ALJ simply discussed how the medical expert, Dr. Boggess disagreed with Ms. Reynolds. (Id.) He therefore contends that as the treating psychologist, Ms. Reynolds's opinion should have been given controlling weight over the non-examining medical expert. (Id.) Claimant further contends that the ALJ erred by failing to develop the record as to Claimant's invalid MMPI. (Id. at 5-6.)

In response, the Commissioner asserts that the Commissioner was not required to give the opinion of Ms. Reynolds controlling weight because although Claimant referred to her as a treating psychologist, his contact with her was limited. (Document No. 11 at 17.) The Commissioner notes that Claimant visited with Ms. Reynolds only on six occasions, and therefore, did not have the treatment relationship as contemplated by the Regulations. (Id.) Furthermore, the Commissioner asserts that Ms. Reynolds's assessment was, in part, inconsistent with the other substantial evidence of record. (Id. at 17-18.) Regarding Claimant's argument of failure to develop the record, the Commissioner asserts that at the second administrative hearing, counsel appeared to have agreed that there was no need for an additional psychological evaluation. (Id. at 19.) Furthermore, the Commissioner asserts that Dr. Boggess's and Dr. Phelps's testimony essentially were the same to the extent that Claimant did not have a severe mental impairment and was consistent with Claimant's testimony regarding his social activities. (Id.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61

Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2008). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2008).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in

9

the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2));

rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and

416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special

significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§

404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the

Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your

residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20

C.F.R. §§ 404.1545 and 416.946 (2008). However, the adjudicator must still apply the applicable

factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved

to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the

adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical

source statement,' which is a 'statement about what you can still do despite your impairment(s)'

made by an individual's medical source and based on that source's own medical findings." Id. SSR

96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's

medical source reflecting the source's opinion based on his or her own knowledge, while an RFC

assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the

other evidence in the case record about what an individual can do despite his or her impairment(s)."

Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927,

providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors

set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2008). These factors include: (1) length of the

treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship,

(3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." <u>Id.</u> §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2008). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. <u>Id.</u> §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. <u>See</u> 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2) (2008). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2008). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

Dr. Haikal's Opinion:

The record demonstrates that Claimant treated with Dr. Elias Haikal, M.D., a family practitioner, from May 9, 2002, through November 11, 2004. (Tr. at 221-34.) On May 9, 2002, Claimant complained of neck, upper back, and right knee pain following a motor vehicle accident. (Tr. at 234.) Dr. Haikal assessed acute cervical and low back strain and a right knee sprain. (Id.) He recommended rest and a heat pack. (Id.) Claimant reported continued back pain with numbness on May 16, 2002. (Tr. at 233.) On August 5, 2002, Dr. Haikal noted that Claimant weighed 268 pounds and complained of pain in his shoulder blades with movement of the right arm, as well as continued back pain on bending. (Tr. at 232.) Dr. Haikal assessed low back pain/strain and noted that he was to continue physical therapy. (Id.) On August 15, 2002, Dr. Haikal noted that Claimant continued to

12

suffer significant pain and recommended rest. (Tr. at 231.) Claimant continued to complain of back

pain and stiffness on August 29, 2002, but noted that his pain was getting better. (Tr. at 230.) On

October 10, 2002, Claimant reported that he was feeling much better but had to be careful of back

movement. (Tr. at 229.) Dr. Haikal noted that Claimant had gained weight and weighed 276 pounds.

(Id.) On October 25, 2002, Dr. Haikal noted Claimant's reports that his back pain was better, but that

the pain came and went. (Tr. at 228.)

On March 13, 2002, Dr. Haikal noted that Claimant had gained six pounds and weighed 278

pounds. (Tr. at 227.) He also noted Claimant's reports of muscles pulling in his back with his head

bent and that it felt like bones rubbing together when arising from sitting. (Id.) On exam, Dr. Haikal

noted tenderness to Claimant's neck and upper back with considerable rigidity and decreased range

of motion. (Id.) Dr. Haikal assessed chronic upper back pain and prescribed medication. (Id.) On

April 15, 2003, Claimant reported that he was somewhat better with physical therapy. (Tr. at 226.)

On April 29, 2003, Claimant complained of low back pain and a tingling sensation after sitting for

a while, but reported that the pain between his shoulder blades had subsided. (Tr. at 225.) Dr. Haikal

diagnosed chronic back strain and recommended that Claimant finish his physical therapy. (Id.)

Claimant reported on May 13, 2003, that if he was active during the day, then he experienced severe

back pain at night, which woke him up two to three times. (Tr. at 224.) On May 27, 2003, Claimant

reported continued back pain, which woke him three to four times each night. (Tr. at 223.) On

physical exam, Dr. Haikal noted tenderness and stiffness of Claimant's back, though there were no

focal neurological deficits. (Id.) Dr. Haikal noted on February 16, 2004, that Claimant weighed 300

pounds. (Tr. at 222.) On physical exam, Dr. Haikal noted that Claimant was in distress with low back

pain and radiation to both legs. (Id.) Claimant described the pain as constant and severe, with partial

relief from narcotic analgesics. (Id.) He also reported intermittent numbness in both legs. (Id.)

Physical exam revealed moderate paraspinal muscle spasm in the low back and decreased range of motion. (Id.) Dr. Haikal reviewed a MRI dated May 30, 2003, and concluded that Claimant had disc herniation at L5-S1, as well as acute and chronic discogenic lower back pain. (Id.) The May 30, 2003, report of Claimant's MRI however, revealed central disc protrusion at L5-S1 and mild effacement of the ventral thecal sac, but did not show a disc herniation. (Tr. at 217.) In a letter dated April 16, 2004, Dr. Haikal noted that Claimant had limited response to physical therapy and that other modalities, such as a TENS unit, failed to relieve his pain. (Tr. at 235.) Dr. Haikal indicated that Claimant's prognosis was guarded regarding his back, and that his treatment would consist of physical therapy, and that modalities such as injections and electro-stimulation would be considered. (Id.)

On September 18, 2007, Dr. Haikal completed a form Medical Assessment of Ability to do Work-Related Activities (Physical). (Tr. at 336-39.) Dr. Haikal opined that Claimant was capable of lifting and carrying ten pounds occasionally and 15 pounds frequently, due to tenderness and stiffness of his lower back, as well as due to a swollen right knee. (Tr. at 336.) He opined that Claimant could stand or walk for a total of one hour during an eight hour workday and for 45 minutes without interruption, and sit for a total of two hours and for only one hour without interruption. (Id.) Dr. Haikal indicated that Claimant frequently could stoop; occasionally balance, crouch, kneel, and crawl; and never climb. (Tr. at 337.) He assessed environmental limitations for temperature extremes, chemicals, dust, noise, fumes, humidity, and vibration due to his back tenderness. (Id.)

In addition to Dr. Haikal, the record reflects that on March 31, 2004, Dr. Robert J. Crow, M.D., a board-certified neurologist, conducted a neurological evaluation at Dr. Haikal's request. (Tr. at 21, 219-20.) Neurologic exam revealed a normal gait with excellent toe and heel walking. (Tr. at 219.) Claimant's range of low back motion was limited but straight leg raise and cross straight leg

14

raise tests were negative. (Id.) Motor and sensory examinations were intact. (Id.) Dr. Crow reviewed Claimant's May 2003, MRI of the lumbar spine and noted the presence of some mild degenerative changes at L5-S1 with a central disc bulge, but no evidence of disc herniation, nerve root impingement, or canal stenosis. (Tr. at 21, 220.) Dr. Crow assessed chronic low back pain without having surgically correctable lumbar pathology. (Id.) He recommended continued conservative management of Claimant's discomfort, including rest, anti-inflammatory medications, physical therapy on an as-needed basis, and weight reduction. (Id.)

Claimant was in a motorcycle accident on March 18, 2005, but suffered no fractures or dislocations. (Tr. at 238-40.) On April 5, 2005, Dr. Stanley S. Tao, M.D., an orthopedic surgeon, evaluated Claimant's complaints of right knee pain following his motorcycle accident. (Tr. at 248-50.) On physical exam, Dr. Tao noted that Claimant was mildly obese and walked on crutches. (Tr. at 249.) Claimant had a slight loss extension and the x-rays of his knee were normal. (Id.) Dr. Tao assessed a probably right ACL/MCL tear and recommended surgery. (Id.) On May 9, 2005, Dr. Tao noted that Claimant was treated with a hinged knee brace locked at 30 degrees. (Tr. at 245.) Dr. Tao noted that Claimant's condition required surgery. (Id.)

On July 23, 2005, Dr. Uma P. Reddy, M.D., a state agency physician, completed a physical RFC assessment of the evidence as of June 30, 2004, Claimant's date last insured. (Tr. at 251-58.) Dr. Reddy opined that as a result of Claimant's history of lumbar and cervical strains he could perform work at the medium level of exertion with occasional postural limitations, except that he could never climb ladders, ropes, and scaffolds, or balance. (Tr. at 252-53.) She further opined that Claimant's ability to reach in all directions, including overhead was limited minimally due to his cervical strain and that he should avoid concentrated exposure to extreme cold, vibration, and hazards. (Tr. at 254-55.) Dr. Reddy noted that Claimant maintained a fairly active lifestyle, which

15

included riding four wheelers and fishing. (Tr. at 258.) Dr. Reddy also completed a current physical RFC assessment, which was consistent with the previous assessment. (Tr. at 259-66.)

On April 25, 2006, Dr. Wilfredo N. Molano, M.D., conducted a consultative physical examination on Claimant's complaints of right knee and back injuries. (Tr. at 268-71.) Dr. Molano noted that Claimant no longer used the right knee brace. (Tr. at 269.) Physical exam revealed that Claimant was able to squat only halfway down to the floor, and that he was able to put on his shoes, socks, and clothing without discomfort. (Tr. at 270.) Straight leg raising was 90 degrees in sitting position and 75 degrees in supine position. (Id.) Grip strength testing was normal and he exhibited no sensory deficits. (Tr. at 270-71.) Lumbar flexion and extension was 45 degrees. (Id.)

Dr. Amy Wirts, M.D., a state agency physician, completed a form physical RFC assessment on May 12, 2006, which was consistent with Dr. Reddy's assessment, except that she did not assess any manipulative limitations. (Tr. at 274-81.) She noted that Claimant was morbidly obese with a BMI of 42, and that he had lumbar, cervical, and right knee strains. (Tr. at 279.)

Claimant underwent an MRI of his right knee on August 8, 2006, which revealed a questionable tear along the proximal attachment of the anterior cruciate ligament, and of his lumbar spine, which revealed mild disc bulge at L5-S1, but no focal herniation. (Tr. at 319.) Claimant further underwent right knee arthroscopy with arthroscopic-assisted hamstring allograft ACL reconstruction on October 16, 2006, by Dr. Tao. (Tr. at 298-300.) As of February 19, 2007, Claimant's gait and sensation were normal, and he had some tenderness of the medial joint line and over the MCL insertion. (Tr. at 317.) He was able to straight leg raise with slight lag. (Tr. at 318.)

At the May 23, 2007, administrative hearing, Dr. Judith Brendenmuehl, M.D., testified as a medical expert. (Tr. at 402-04.) Dr. Brendenmuehl noted that Claimant had a mild disc bulge at L5-S1 without herniation. (Tr. at 403.) She opined that Claimant could perform work at the medium

16

exertional level with occasional postural limitations except that he could not climb ladders, ropes, or scaffolds. (Id.) At the March 6, 2008, administrative hearing, Dr. Robert Marshall, M.D., also testified as a medical expert. (Tr. at 428-42.) Dr. Marshall opined that Claimant's impairments did not meet or equal a listing. (Tr. at 21, 428.) Regarding Claimant's back, Dr. Marshall categorized his condition as nothing more than a backache and questioned why Dr. Haikal prescribed narcotics to control the alleged pain. (Tr. at 21, 429.) Dr. Marshall explained that x-rays of the lumbar spine following Claimant's motor vehicle accident, showed no evidence of injury. (Tr. at 21, 430.) He noted that the May 2003, MRI revealed only mild degenerative changes without any evidence of herniation, nerve impingement, or spinal stenosis. (Tr. at 21, 430-31.) Respecting Claimant's right knee, Dr. Marshall noted that Claimant had a partial tear of the anterior cruciate ligament and that he had surgery to correct the tear. (Tr. at 21, 431.) Dr. Marshall acknowledged that Claimant was examined by Dr. Crow, a neurosurgeon, and that he observed that Claimant walked with a normal gait and that his neurological exam of Claimant was normal. (Id.)

Dr. Marshall also acknowledged the RFC assessment by Dr. Haikal and opined that his opinions were "absolute rubbish" and not supported by the evidence of record. (Tr. at 23, 432.) Dr. Marshall however, agreed with the opinion of Dr. Brendenmuehl that Claimant was capable of performing work at the medium level of exertion. (Tr. at 23, 435.)

In her decision, the ALJ summarized Dr. Haikal's opinion, and noted that there was a three year gap between Dr. Haikal's last examination of Claimant and the preparation of his opinion. (Tr. at 23.) Te ALJ also noted that Dr. Haikal was Claimant's treating physician. (Id.) The ALJ concluded that there was an inconsistency between Dr. Haikal's treatment records and his opinion. (Tr. at 23-24.) Consequently, the ALJ gave much greater weight to the opinion of Dr. Marshall than to Dr. Haikal's opinion. (Tr. at 24.) In giving lesser weight to Dr. Haikal's opinion, the ALJ noted that there

was a three-year gap between Dr. Haikal's last examination of record of Claimant and Dr. Haikal's assessment on September 18, 2007. (Tr. at 23.) Furthermore, he noted Dr. Marshall's testimony that none of Dr. Haikal's treatment records reflected a significant problem to justify his extreme assessed limitations. (Id.) Thus, due to the inconsistency between Dr. Haikal's treatment notes and opinion and the three-year gap, the ALJ gave greater weight to the opinion of Dr. Marshall.

The undersigned finds that the ALJ's decision to give greater weight to Dr. Marshall's opinion is supported by substantial evidence. The ALJ acknowledged in her decision the factors set forth in the Regulations regarding the weight assigned treating physicians' opinions, but ultimately concluded that Dr. Haikal's opinion was inconsistent with his own treatment notes, as well as Dr. Marshall's testimony. As discussed above, Dr. Haikal's treatment notes through November 11, 2004. His notes reflected a few instances of Claimant's subjective reports of significant or severe back pain. Nevertheless, the bulk of his treatment notes reflect that Claimant's condition was getting better, that the objective evidence failed to demonstrate significant findings, and that there were no limitations of activity throughout his treatment of Claimant. Based on the other substantial evidence of record, Dr. Marshall opined that Dr. Haikal's extreme limitations were not supported by the record. Though Claimant was advised to lose weight and that the weight contributed to his pain, the substantial evidence of record did not support Dr. Haikal's assessed limitations and therefore, the AlJ was entitled to rely on the testimony of the medical expert. Accordingly, the undersigned finds that the ALJ's decision to accord greater weight to Dr. Marshall's opinion than to Dr. Haikal's opinion is supported by substantial evidence.[2]

---

[2] Regarding Dr. Haikal's treatment notes submitted to the Appeals Council for the period between November 11, 2004, and September 18, 2007, the undersigned notes that the exhibits apparently were not made a part of the record and were not included in the transcript of the administrative record available for this Court's review.

<u>Mareda Reynolds's Opinion</u>.

The medical record reflects that on August 18, 2006, Mareda L. Reynolds, M.A., a licensed psychologist, conducted a psychological evaluation. (Tr. at 325-32.) Claimant reported that he had never received mental health treatment. (Tr. at 325.) He also reported having experienced feelings of hopelessness, helplessness, worthlessness, as well as sadness, crying spells, decreased energy, and increased irritability. (<u>Id.</u>) On mental status exam, Ms. Reynolds observed that rapport was slowly established and was sufficient for purposes of the assessment; that Claimant was guarded with all requested information; that his social interaction was mildly deficient and that eye contact was fair. (Tr. at 327.) Claimant spoke at a normal rate and volume and in complete sentences that were easily understandable. (<u>Id.</u>) His speech was spontaneous, relevant, coherent, and clear. (<u>Id.</u>) She noted that Claimant was alert and oriented, that his mood was dysphoric and affect was mildly constricted, but appropriate to expressed ideas. (<u>Id.</u>) Ms. Reynolds noted that his insight and judgment were adequate, his memory was within normal limits, but his attention and concentration were mildly deficient. (<u>Id.</u>) She noted that Claimant was ambulatory with effective use of all extremities. (<u>Id.</u>) Ms. Reynolds assessed depressive disorder, not otherwise specified ("NOS"). (Tr. at 328.)

Ms. Reynolds further opined that Claimant was markedly limited in his ability to maintain regular attendance and be punctual within customary tolerances. (Tr. at 330.) She also opined that he was moderately limited in his ability to understand and remember detailed instructions, maintain attention for extended periods, and complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 330-31.) She indicated that all other areas of functioning were limited only slightly or none. (<u>Id.</u>)

On August 20, 2007, Elizabeth Durham, M.A., a licensed psychologist, conducted a

19

psychological evaluation of Claimant. (Tr. at 340-45.) Ms. Durham observed that Claimant did not utilize any ambulatory aids. (Tr. at 340.) Claimant reported difficulties sleeping, a fair appetite, and denied crying spells. (Tr. at 341.) On mental status exam, Ms. Durham noted that Claimant was cooperated and exhibited a good attitude with normal eye contact. (Tr. at 342.) His speech was relevant and coherent, he was fully oriented, but his mood was dysphoric and his affect was restricted. (Id.) Claimant's insight was fair and his judgment normal, as was his memory, concentration, and psychomotor behavior. (Id.) On the MMPI-2, Claimant put forth adequate effort and was cooperative, but the results were considered invalid. (Id.) Ms. Durham diagnosed depressive disorder NOS, and noted that his prognosis was fair. (Tr. at 342-43.) She further assessed that his social functioning, persistence, and pace all were within normal limits. (Tr. at 343.) Ms. Durham also completed a form Medical Source Statement of Ability to do Work-Related Activities (Mental), on which she opined that Claimant's limitations were no more than mild. (Tr. at 345-47.)

At the May 23, 2007, administrative hearing, Dr. Jeffrey Boggess, Ph.D., a clinical psychologist, testified as a medical expert. (Tr. at 404-07, 413-14.) Regarding Ms. Reynolds's marked limitation on punctuality, Dr. Boggess opined that such limitation resulted from his failure to attend appointments with Ms. Reynolds. (Tr. at 405.) He did not agree with the moderate limitations assessed by Ms. Reynolds because she did not perform any testing to support her assessments. (Tr. at 405-06.) Dr. Boggess opined that Claimant had none to slight limitations in attention and concentration, which were secondary perhaps to some moderate limitations in social functioning. (Tr. at 406.) He further opined that Claimant had only mild limitations in activities of daily living, and that Claimant did not have any marked limitation resulting from his depression. (Tr. at 407.)

At the March 6, 2008, administrative hearing, William Phelps, M.A, a licensed psychologist

testified that the record contained no evidence of a mental impairment. (Tr. at 443, 446.) He further testified that the conditions surrounding Claimant's MMPI could have rendered the test invalid. (Tr. at 447.)

In her decision, the ALJ assessed mild limitations in his ability to maintain activities of daily living, social functioning, concentration, persistence, and pace, and no episodes of decompensation. (Tr. at 20.) The ALJ gave some weight to Ms. Durham's report based on the testimony of the medical expert. (Id.) The ALJ concluded that Claimant's depression did not cause more than minimal limitations in his ability to work, and therefore, found that the impairment was not severe. (Tr. at 18.) As stated above, the ALJ considered the four functional areas under the Regulations and concluded that he had no more than mild limitations in any area. The medical record reflects Claimant's report that he saw Ms. Reynolds only six times (Tr. at 340-41.) Though the ALJ did not specifically assign any weight to the opinion of Ms. Reynolds, it is clear from her decision that she did not give it controlling weight. The AlJ found that her report indicated that Claimant was visited by friends twice a week and shopped twice a week and that his memory was within normal limits. (Tr. at 20.) The ALJ also noted that Claimant failed to complete treatment with Ms. Reynolds and had cancelled several appointments with her. (Tr. at 19.) Thus, Ms. Reynolds's report does not support extreme limitations regarding Claimant's mental functioning. Both the medical experts essentially agreed in their assessments that Claimant did not have a severe mental impairment, which was consistent with Ms. Durham's findings. Additionally, as the Commissioner points out, the record reflects that Claimant worked during much of the relevant time period. Accordingly, the undersigned finds that the substantial evidence of record supports the ALJ's decision that Claimant neither had a severe mental impairment or that the opinion of Ms. Reynolds was entitled controlling weight.

21

2. <u>Duty to Re-Contact Medical Providers</u>.

Claimant next alleges that the ALJ erred in failing to re-contact Claimant's treating medical providers as required by 20 C.F.R. § 404.1512(c). (Document No. 10 at 6-7.) He asserts that the ALJ should have re-contacted Claimant's treating sources if there was a question or ambiguity in their reports. (<u>Id.</u> at 7.) He asserts that the ALJ should not have relied on Dr. Boggess's testimony that Ms. Reynolds's assessed marked limitation in the ability to maintain attendance was due to his failure to attend his appointments with her. (<u>Id.</u>) He asserts that unless the ALJ knew for certain that was why Ms. Reynolds made such a severe assessment, and that it was not based on another psychological reason, then she should have re-contacted Ms. Reynolds for clarification. (<u>Id.</u>) Furthermore, Claimant asserts that had the ALJ re-contacted Dr. Haikal, she would have known that there was not a gap in treatment but that medical records were being submitted to the ALJ. (<u>Id.</u>)

In response, the Commissioner asserts that the evidence the ALJ received regarding Claimant's alleged mental impairment and his physical impairments was not inadequate to make a finding that Claimant was capable of performing other work, and therefore, the ALJ was not required to re-contact Claimant's treating medical providers. (Document No. 11 at 19-20.)

The Court agrees with the Commissioner and finds Claimant's argument on this point unavailing. In <u>Cook v. Heckler</u>, 783 F.2d 1168, 1173 (4th Cir. 1986), the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." <u>Id.</u> The Court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of his duty to develop the

evidence.  Id.

It is nevertheless Claimant's responsibility to prove to the Commissioner that he or she is disabled.  20 C.F.R. §§ 404.1512(a), 416.912(a) (2008) (stating that "in general, you have to prove to us that you are blind or disabled. This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s).") Thus, the claimant is responsible for providing medical evidence to the Commissioner showing that she has an impairment.  Id. §§ 404.1512(c), 416.912(c). The Regulations provide that: "You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled." §§ 404.1512 (c); 416.912(c)(2008).  In Bowen v. Yuckert, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings.  It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step.  The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . .  If the process ends at step two, the burden of proof never shifts to the Secretary.  . . .  It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. at 146, n. 5; 107 S.Ct. at 2294, n. 5 (1987). Thus, although the ALJ has a duty to develop the record fully and fairly, he is not required to act as the claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). Claimant bears the burden of establishing a *prima facie* entitlement to benefits.  See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")  Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

As the Commissioner points out, counsel appeared to have agreed at the second administrative hearing that there was no need for an additional psychological evaluation. (Tr. at 453-54.) Additionally, the medical experts' testimony was essentially consistent with each other and with Claimant's testimony regarding his social activities. Thus, additional psychological testing was not warranted. Furthermore, the undersigned finds that there was no need to re-contact Claimant's treating sources because the evidence before the ALJ was sufficient. Accordingly, the undersigned finds that Claimant's argument in this regard is without merit.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the District Court confirm and accept the foregoing findings, **DENY** Plaintiff's Motion for Judgment on the Pleadings (Document No. 10.), **GRANT** the Commissioner's Motion for Judgment on the Pleadings (Document No. 11.), and **DISMISS** this action from the docket of the Court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United

24

States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984).  Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

DATE: September 3, 2010.

R. Clarke VanDervort
United States Magistrate Judge